# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

WESLEY WAGNER (01),

    Defendant.

Case No. 17-40097-01-DDC

## MEMORANDUM AND ORDER

This case arises from the FBI's investigation of "Playpen"—a website hosting child pornography. In late 2014, the FBI discovered Playpen. Later, it determined the physical location of the server used by the website. And, in January 2015, the FBI seized that server. After seizing the server, law enforcement operated the Playpen site from a location in the Eastern District of Virginia from February 20, 2015, until the FBI permanently disabled the website on March 4, 2015.

While law enforcement operated Playpen, they deployed a computer program known as the Network Investigative Technique ("NIT") trying to ascertain the identity of Playpen's users. The FBI traced one user—"soldiermike"—to an IP address registered to defendant Wesley Wagner. Using this information, the FBI secured a search warrant for Mr. Wagner's residence in White City, Kansas. When the FBI executed the search warrant, agents interviewed Mr. Wagner.

Now, Mr. Wagner claims that the government secured his statements during the interview by using unconstitutional means. So, he asks the court to suppress those statements. Mr. Wagner also asks the court to dismiss the Indictment against him because, he says, the FBI's

continued operation of Playpen amounted to outrageous conduct.  The court disagrees with Mr. Wagner's motions and denies them both.

## I. Background

In a two-count Indictment, the government charged defendant Wesley Wagner with receipt and possession of child pornography.  These charges arise from an investigation of the website, "Playpen" (also referred to as "Website A").  Playpen was a hidden service website operating on the Tor network; it allowed registered users to access child pornography.

The FBI seized control of the Playpen website around February 20, 2015.  The FBI then secured a warrant to deploy the NIT to any computer accessing the Playpen website.  The FBI operated the website from a government facility located in the Eastern District of Virginia from about February 20, 2015, to March 4, 2015.

While the FBI controlled Playpen, it did not alter the website's functionality, add additional images, or actively solicit new users.  Its passivity did not keep some 100,000 users from logging into the site more than 1,000,000 times during that 13-day period.  The government has acknowledged that a minimum of 22,000 pictures, videos, and additional links to child pornography were distributed while it controlled Playpen.  The FBI also maintained a "How To" advice section on the site.  The section explained how users could go about sexually abusing children and avoiding detection, as part of an effort to enhance Playpen's credibility as an illicit site.  To be clear, the FBI did not create this section of the website or draft any of the content that users could access there.  But during the FBI's control of Playpen, users could add—and did add—new posts to this section.

During the investigation, a Playpen user with the username "soldiermike" actively logged into the website for a total of eight hours and 59 minutes between January 31, 2015 and March 4,

2015. "soldiermike" logged into Playpen on February 28, 2015, using IP address 205.214.245.193—an address controlled and operated by The Tri-County Telephone Association. The account information for Tri-County's subscriber shows that, on February 28, 2015, this IP address belonged to Mr. Wagner in White City, Kansas.

On September 15, 2015, Task Force Officer ("TFO") Angie Jones, a Kansas Bureau of Investigation agent assigned to the FBI, procured a federal search warrant for Mr. Wagner's residence. The affidavit supporting the search warrant included information about Playpen and how the FBI had identified the IP addresses using it. The affidavit also identified "soldiermike" as a user of Playpen, and the connection between the IP address associated with "soldiermike" and Mr. Wagner's internet service.

On September 17, 2015, TFO Jones and other investigators executed the search warrant at Mr. Wagner's residence. Six law enforcement officers participated in the search. The search began around 7:00 a.m., and concluded at about 9:30 a.m.

During the search of Mr. Wagner's residence, investigators seized many electronics, including laptops, storage devices, and a desktop computer. According to the FBI, when they examined the electronic devices, they found items relevant to the investigation on the hard drive of a Dell Inspiron 1501. Investigators had seized this laptop from a common area of Mr. Wagner's residence.

Also, while executing the search warrant, TFO Jones and FBI Special Agent Mike Daniels interviewed Mr. Wagner twice. The initial interview lasted about 48 minutes. The second interview lasted about five minutes. The investigators recorded the audio of both interviews. *See* Pl Ex. 9.

Initially, TFO Jones and Agent Daniels engaged Mr. Wagner and his wife together. Almost immediately, TFO Jones informed them that neither were under arrest and that they were free to leave at any time. About one minute later, TFO Jones repeated that neither Mr. Wagner nor his wife were "going with [the FBI] today," and that the investigators would "get out of [their] hair as soon as [they] [could]." Ex. 9 (Audio Recording of Sept. 17, 2015 interview, titled "approach and Wesley.WMA") at 1:01–07. During this interview, the investigators gathered a shirt and shoes for Mr. Wagner and a jacket for his wife to wear.

About two minutes into the interview, the investigators told Mr. Wagner's wife that she could wait on the porch so they could speak with Mr. Wagner first. TFO Jones, Agent Daniels, and Mr. Wagner then went to sit on a bench under a tree in the Wagner's front yard. Later, when it started to rain, they got inside one of the police vehicles, on-site. About six minutes into the interview, TFO Jones again advised Mr. Wagner that when the interview was finished, he could "hang out" on the porch until investigators had concluded their search.

During this initial interview, Mr. Wagner said that no one other than he and his wife had stayed at the residence since 2013, and that his wi-fi service was password protected. Mr. Wagner denied knowing anything about the "Tor browser" or "the Onion network."

About 25 minutes into the interview, the investigators informed Mr. Wagner that someone from his house had accessed the Tor network and specifically, a child pornography website. Investigators informed Mr. Wagner that it must have been him or his wife, and they assumed it was not his wife. Investigators also informed Mr. Wagner that they "just want[ed] to get to the bottom of this and what's going on" . . . "so [they] [could] wrap this up and move on because" they really wanted to identify people who were harming children. Ex. 9 at 26:50–27:10. A few minutes later, the investigators emphasized their desire to confirm that no one else

4

had stayed at the residence and no one else could access Mr. Wagner's wireless network. He confirmed both points. About 30 minutes into the interview, the investigators emphasized that they knew Mr. Wagner's computer had accessed the Tor network. The investigators then asked Mr. Wagner—if he had not accessed Playpen, then was he telling them that his wife had accessed it?

Some 40 minutes into the interview, the investigators said they were going to talk to Mr. Wagner's wife, and if necessary come back and talk with him again. TFO Jones advised Mr. Wagner that this was "really his only opportunity" because, once the investigators left the residence, the "computer speaks for itself so just spit it out, tell [them] what [they] need[ed] to know." *Id.* at 40:18–31.

During this initial interview, the investigators discussed the side effects of Mr. Wagner's "PTSD" diagnosis with him. Mr. Wagner said he suffered from depression, anger issues, sleep disorder, and hypervigilance. Mr. Wagner also said that he took a sleep medication. Earlier in the interview, the investigators asked Mr. Wagner whether he needed any of medications. They also told him if he needed a medication, he should let them know.

While investigators were searching the house under the search warrant, they previewed the electronic devices. They quickly located the Tor icon on a laptop that Mr. Wagner identified as his. The laptop also contained folders with child pornography saved in them.

Agent Daniels began the second interview with Mr. Wagner by showing him the Tor icon on the laptop's desktop. But Mr. Wagner continued to deny any knowledge of Tor or of the child pornography saved on the laptop. Agent Daniels again pointed out that just two people had used the computer, and that someone was responsible for the child pornography on the computer. Agent Daniels informed Mr. Wagner that either he or his wife were responsible for it.

5

Although the tone of the initial interview was cordial, Mr. Wagner's attitude changed during the second interview. After investigators confronted him with the evidence on the computer, Mr. Wagner ordered the investigators to read him his rights or get out of his house. Another Task Force Officer advised him that investigators were not leaving his house, and were not reading him his rights because he was not under arrest. At that point, Mr. Wagner advised that he was not answering any more questions.

## II. Analysis

With his two motions, Mr. Wagner asks the court: (1) to suppress the statements he made on September 17, 2015, during the search of his home; and (2) to dismiss the Indictment against him. The analysis that follows addresses these requests in separate sections.

### A. Motion to Suppress Statements (Doc. 27)

First, Mr. Wagner asks the court to suppress evidence of incriminating statements he made on September 17, 2015, during the search of his home. He seeks suppression under two theories found in the Fifth Amendment. First, Mr. Wagner challenges these statements under the Self-Incrimination Clause because the FBI failed to inform him of his *Miranda*[1] rights before conducting, what he says was, a custodial interrogation. Next, he challenges the voluntariness of the statements under the Due Process Clause. Mr. Wagner's challenges and the government's responses are discussed, separately, in the next two subsections.

#### 1. *Miranda*

The Fifth Amendment to the United States Constitution protects individuals from being compelled to incriminate themselves. U.S. Const. amend. V. To ensure that people understand this guarantee, the Supreme Court established procedural safeguards that police must satisfy

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

before questioning people. *Miranda*, 384 U.S. at 444. These safeguards take the form of *Miranda* warnings—a proactive recitation of rights that police must deliver. A law enforcement officer does not need to recite this liturgy before she asks anyone anything. Instead, an officer must recite it before commencing a custodial interrogation. *Id.* at 444. Thus, to determine whether law enforcement must give *Miranda* warnings, courts consider two factors: (a) whether the law enforcement officers interrogated him; and (b) whether the person was in custody.

### a. Interrogation

In the *Miranda* context, the term "interrogation" refers to "express questioning," or "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). While the officer's intent is not irrelevant to this inquiry, the courts consider whether a reasonable officer would foresee that her questions or conduct would elicit an incriminating response. *Id.* at 300–02. These questions become the functional equivalent of expressly questioning a person about their criminal liability. *Id.*

Here, the government does not dispute that TFO Jones and Agent Daniels "interrogated" Mr. Wagner. Indeed, they expressly questioned Mr. Wagner about his involvement with the Tor network and the illegal child pornography hosted there. So here, the *Miranda* issue turns on the custody part of the formulation.

### b. Custody

A person is in custody for *Miranda* purposes "when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest." *United States v. Cronin*, 540 F. Supp. 2d 1189, 1191 (D. Kan. 2008) (first citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); then

citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  In other words, a person is in custody when he is arrested or subjected to circumstances that are "the functional equivalent of [a] formal arrest."  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  Here, law enforcement officers told Mr. Wagner that he was not under arrest and, in fact, they never arrested him on September 17, 2015.  The court thus must determine whether the circumstances were the functional equivalent of an arrest.

To determine if a person was subjected to circumstances that were the functional equivalent of a formal arrest, "[c]ourts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'"  *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).  The Tenth Circuit has identified a non-exhaustive list of factors that courts must use to evaluate the relevant circumstances:  (1) "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will;" (2) "'the nature of questioning,' where 'prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave;'" and (3) "whether police dominate the encounter."  *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008) (quoting *United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993)).  Here, all three factors weigh against custody.

The first factor weighs against Mr. Wagner because, almost immediately, TFO Jones informed Mr. Wagner that he was free to leave at any time.  Then, several minutes later, she told Mr. Wagner that he could "hang out" on the porch when the interview was over.  Also, during the June 19, 2018, hearing on this motion, TFO Jones testified that she informed Mr. Wagner

that if he stayed at the house he needed to remain within eye sight of a law enforcement official. But TFO Jones also advised Mr. Wagner that he was free to leave the residence at any time.

Other Circuits have recognized the importance of advising a suspect that he is not under arrest. *See, e.g.*, *United States v. Griffin*, 922 F.2d 1343, 1349–50 (8th Cir. 1990) ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of . . . freedom of action is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will. Where a suspect has been so advised, custody has frequently been found to not exist." (internal quotation marks and citations omitted) (ellipses in original)); *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985) (informing a suspect that he is not under arrest is one factor frequently considered to show the absence of custody); *United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir. 1985) (finding it significant that the suspect was informed explicitly that he was not under arrest). Although these cases do not bind the court, they are highly persuasive. As the court already has noted, law enforcement advised Mr. Wagner twice in two different ways that he was not under arrest. The "[l]ack of arrest is a very important factor weighing against custody." *United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (internal quotation marks and citation omitted). The FBI did not arrest Mr. Wagner on September 17, 2015.

The second factor—the nature of questioning—also weighs against custody. This factor asks whether the suspect experienced prolonged accusatory questioning that created a coercive environment that made him feel as if he was not free to leave. *See Jones*, 523 F.3d at 1240. When law enforcement officers do not question aggressively, the Tenth Circuit has found, interviews lasting up to three hours are not custodial. *See United States v. Zar*, 790 F.3d 1036, 1048 (10th Cir. 2015); *see also United States v. Lemon*, 714 F. App'x 851, 857 (10th Cir. 2017).

9

After reviewing the audio recording of Mr. Wagner's interview (Ex. 9), the court finds that the officers questioned Mr. Wagner in a cordial manner during both interviews. While they may have become more insistent at times—especially during the second interview—their insistence never became "coercive." *See* Pl. Ex. 9 ("approach and Wesley.WMA" at 40:18–31 ("The computer speaks for itself so just spit it out, tell us what we need to know."); "wesley 2.MWA" at 1:44–50 ("Only two people use this computer. Somebody is responsible for [child pornography] being on there.")). And importantly, Mr. Wagner demonstrated that he did not feel like he was not free to leave because he ended the questioning.

Last, the encounter was not police-dominated. Circumstances indicating a police-dominated environment include:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Griffin*, 7 F.3d at 1519. Although some of these circumstances were present here, they did not create a police-dominated environment. Mr. Wagner was separated from his wife, but the facts suggest they were both outside the house and Mr. Wagner's wife was on the front porch—within his line of sight. Also, six officers were present, but only two questioned Mr. Wagner. None of the other *Griffin* factors apply.

Viewing all the circumstances of Mr. Wagner's questioning, Mr. Wagner was not in custody. The court finds that the officers advised Mr. Wagner that he was not under arrest, they did not arrest him, and Mr. Wagner ended the questioning on his own initiative. These facts suggest non-custodial questioning. The court thus concludes that Mr. Wagner was not in custody when the FBI questioned him. And so, the court denies his request to suppress his statements under the Self-Incrimination Clause.

## 2. Voluntariness

Mr. Wagner also challenges the voluntariness of these statements under the Due Process Clause of the Fifth Amendment. "The Government bears the burden of showing, by a preponderance of the evidence, that a confession is voluntary." *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)).

"When the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). The court must determine a statement's voluntariness based on the "totality of the circumstances"— considering "'both the characteristics of the accused and the details of the interrogation'" where "'no single factor is determinative.'" *Lopez*, 437 F.3d at 1063 (first quoting *Toles*, 297 F.3d at 965; then quoting *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999)). The relevant factors are: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *Id.* at 1063–64 (first citing *Toles*, 297 F.3d at 965–66; then citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

Mr. Wagner argues that the FBI used coercive tactics to compel involuntary statements from him. First, he contends that the FBI promised him leniency. Indeed, "'a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced.'" *Lopez*, 437 F.3d at 1064 (quoting *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997)). A promise of leniency must be more than a "limited assurance"—a permissible interrogation tactic. *Id.* (citing *United States*

*v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994)).  To be impermissible, it must "critically impair a defendant's capacity for self-determination."  *Id.*

The only statement one possibly could construe as a promise of leniency is TFO Jones's statement that the FBI "just want[ed] to get to the bottom of this and what's going on . . . so [they could] wrap this up and move on because" they really wanted to identify people who were harming children.  One interpretation of this statement is that Mr. Wagner is not a person harming children so he is not a person of concern to the FBI.  But even if construed in this fashion, this statement stops far short of assuring Mr. Wagner of anything—much less promising that he would receive leniency for his statement.

In *Lopez*, the Circuit affirmed the district court's decision that a law enforcement officer impermissibly promised that the defendant would spend 54 fewer years in prison if he confessed to killing the victim accidentally.  437 F.3d at 1064.  After telling the defendant that he would get six years instead of 60 if he said it was a "mistake," the officer gave the defendant examples of other suspects who had received lenient sentences after confessing to killing by mistake.  *Id.*

Here, TFO Jones and Agent Daniels did not tell Mr. Wagner he would receive less prison time or that they would not pursue criminal charges against him if he provided a statement.  They did not even promise to inform the United States Attorney's Office about Mr. Wagner's cooperation.  And that type of limited assurance is permissible.  *See Lewis*, 24 F.3d at 82.  In sum, if a promise of leniency was made, it did not critically impair Mr. Wagner's capacity to determine what he wanted to do.

Mr. Wagner also suggests that the FBI told him that the forensic evidence against him would be irrebuttable.  But, "'it is well-settled that a confession is not considered coerced merely because the police misrepresent[] to a suspect the strength of the evidence against him.'"  *Lopez*,

437 F.3d at 1064 (quoting *Clanton*, 129 F.3d at 1158). Even the combination of the misrepresentation of the evidence and the promise of leniency did not override Mr. Wagner's will.

Finally, Mr. Wagner asserts that his personal characteristics—military service combined with PTSD, hypervigilance, and social anxiety—made him especially susceptible to coercive tactics. But his personal characteristics, alone, are not enough; "the police must somehow overreach by exploiting a weakness or condition known to exist." *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994) (citing *United States v. Guerro*, 983 F.2d 1001, 1004 (10th Cir. 1993)). No evidence suggests that TFO Jones and Agent Daniels used Mr. Wagner's military service or mental conditions as a tactic to coerce a statement. Instead, the evidence shows just the opposite. They asked Mr. Wagner if he needed any of the medication he took for those conditions.

After considering the circumstances of the interrogation and the characteristics of the defendant, the court concludes that law enforcement did not override Mr. Wagner's will. Importantly, the court again notes that Mr. Wagner ended the questioning—providing strong evidence that whatever tactics the FBI used did not coerce him. Mr. Wagner made any statements voluntarily.

In sum, the court concludes that the FBI's interrogation of Mr. Wagner was non-custodial and Mr. Wagner made any statements to the FBI voluntarily. Accordingly, the court denies Mr. Wagner's Motion to Suppress his statements (Doc. 27).

### B. Motion to Dismiss Indictment (Doc. 32)

Next, Mr. Wagner argues that the court should dismiss the Indictment because the government's conduct was outrageous when it continued to operate the Playpen website. To

date, every district court to consider this argument has rejected it. *See United States v. Schreiber*, No. 15-CR-377 (ENV), 2018 WL 276347 (E.D.N.Y. Jan. 3, 2018) (collecting cases); *United States v. Cookson*, No. 17-10087-1-JTM, 2017 WL 5629678 (D. Kan. Nov. 22, 2017) (Marten, J.) (same); *United States v. Pawlak*, 237 F. Supp. 3d 460 (N.D. Tex. 2017); *United States v. Perdue*, 237 F. Supp. 3d 471 (N.D. Tex. 2017); *United States v. Kim*, No. 16-CR-191 (PKC), 2017 WL 394498 (E.D.N.Y. Jan. 27, 2017) (collecting cases); *United States v. Tran*, 226 F. Supp. 3d 58, 63 (D. Mass. 2016).

"When the government's conduct during an investigation is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct." *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir. 1992). "A defendant may challenge such conduct by means of the outrageous conduct defense, which is predicated on the Due Process Clause of the Fifth Amendment to the United States Constitution." *Id.* at 908–09. This defense requires government conduct that is "shocking, outrageous, and clearly intolerable." *Id.* at 910 (citing *United States v. Russell*, 411 U.S. 423, 432 (1973)). Specifically, Mr. Wagner must prove either: "(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime." *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013) (quoting *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994)). Here, Mr. Wagner has proved neither.

*First*, the government did not create the crime—the Playpen website was operational long before the FBI seized its server. And Mr. Wagner accessed the website before the FBI deployed the NIT. Due Process violations occur "only when the government engineers and directs the criminal enterprise from start to finish." *Id.* (quoting *Pedraza*, 27 F.3d at 1521) (internal quotation marks and brackets omitted). Conversely, "the government is free to infiltrate an

14

ongoing criminal enterprise, and to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Id.* (quoting *Mosley*, 965 F.2d at 911) (internal quotation marks omitted). Here, Playpen operated before the FBI took over its operation. So, the FBI didn't operate the criminal enterprise from start to finish.

*Second*, the government did not induce Mr. Wagner to access Playpen. As already noted, Mr. Wagner accessed the website before the FBI controlled it. And no evidence suggests that the government induced Mr. Wagner to access it three more times after the FBI had control of the site.

Finally, Mr. Wagner makes three additional arguments why the court should dismiss the Indictment. The most recent court to address this issue—*Schreiber*—already has rejected these three arguments as well. First, Mr. Wagner cannot show outrageous conduct through re-victimization of the children because he must show that the "government caused him to commit a crime that would otherwise not have been committed." *See Schreiber*, 2018 WL 276347, *4. Next, Mr. Wagner's argument that the government violated child pornography laws fails because "the government is free to infiltrate an ongoing criminal enterprise," *see Dyke*, 718 F.3d at 1288, and if the government violated any laws, "any violation should be remedied by prosecuting the agents, not dismissing the indictment," *see Schreiber*, 2018 WL 276347, *5. Last, Mr. Wagner fails to show outrageous conduct because the government failed to use alternative methods to apprehend Playpen users. "[T]he government . . . is entitled to weigh the relative costs and benefits of the available array of investigatory approaches without being subject to judicial second guessing." *Id.*

The court denies Mr. Wagner's Motion to Dismiss Indictment (Doc. 32).

### C. Motion for Leave to File Additional Motions (Doc. 33)

Finally, Mr. Wagner asks the court to grant him leave to file additional pre-trial motions after the April 13, 2018 deadline established by the court. *See* Doc. 29. Specifically, Mr. Wagner informs the court that discovery still is ongoing. And because of the technical nature of the discovery, Mr. Wagner foresees a need to file more substantive motions based on that discovery. Last, Mr. Wagner believes that motions to compel discovery may be necessary.

The court acknowledges Mr. Wagner's concern that he may want to file more pre-trial motions after the April 13, 2018 deadline. But Fed. R. Crim. P. 12(c)(3) allows the court to consider an untimely pre-trial motion "if the party shows good cause." The court relies on this standard to evaluate possible future motions. To provide Mr. Wagner an advance extension to file more motions would nullify, in effect, the Rule 12 standard.

The court thus denies Mr. Wagner's Motion for Leave to File Additional Motions (Doc. 33).

## III. Conclusion

In sum, the court denies Mr. Wagner's Motion to Suppress Statements (Doc. 27). During the September 17, 2015 interrogation of Mr. Wagner, he was not in custody and his will was not overborne. Accordingly, the FBI did not violate his Fifth Amendment rights. The court also denies Mr. Wagner's Motion to Dismiss Indictment (Doc. 32) because Mr. Wagner failed to prove excessive government involvement in the creation of his crime or significant governmental coercion to induce him to commit a crime. Finally, the court denies Mr. Wagner's Motion for Leave to File Additional Motions (Doc. 33). The court will determine, after Mr. Wagner files an untimely pre-trial motion, whether he has shown good cause for its untimeliness.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Wesley Wagner's Motion to Suppress Statements (Doc. 27) is denied.

**IT IS FURTHER ORDERED THAT** defendant Wesley Wagner's Motion to Dismiss Indictment (Doc. 32) is denied.

**IT IS FURTHER ORDERED THAT** defendant Wesley Wagner's Motion for Leave to File Additional Motions (Doc. 33) is denied without prejudice to a future pre-trial motion filed with good cause shown.

**IT IS SO ORDERED.**

**Dated this 18th day of July, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**